```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,:
                          :
          Plaintiff,      :
                          :      06 Cr. 982 (BSJ)
          v.              :
                          :      Opinion & Order
MICHAEL ANNUCCI,          :
     a/k/a "Mickey Annucci," :
                          :
          Defendant.:     :
                          :
------------------------------x
```

**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**


On September 29, 2006, Defendant Michael Annucci ("Defendant" or "Annucci") was arrested on a warrant issued upon a Complaint.  On February 14, 2007, Defendant was indicted on a four-count Superseding Indictment charging him as follows. Count One charges Defendant with conspiracy, in violation of Title 18, United States Code, Section 371. Count Two charges Defendant with aiding and abetting the embezzlement of monies from employee benefit plans in violation of Title 18, United States Code, Sections 664 and 2.  Count Two alleges that Defendant "participated in a scheme whereby he submitted false shop steward reports that underreported the hours worked by carpenters for a company named L&D Installers ("L&D").  Count Three charges Defendant with wire fraud, in violation of Title 18, United States Code, Sections 1343 and 2.  Count Four charges Defendant with unlawful receipt of payments by a union official,

in violation of Title 29, United States Code, Section 186(a)(1),
(b)(1), and (d)(2).  Before the Court are Defendant's motions to
suppress his post-arrest statements and to dismiss Count Two of
the Indictment on the ground that the allegedly delinquent
employer contributions cannot be the subject of an embezzlement
charge.  For the reasons set forth below Defendant's motions are
DENIED.

***Background***

     The Court held a suppression hearing regarding Defendant's
arrest and his post-arrest statements on March 20, 2007.  At the
hearing three of the agents who participated in the arrest
testified:  Agent Ryan Gibbs, Agent Marcus Rivera, and Agent
Stephen Donnelly.  Defendant did not testify at the hearing but
he submitted a sworn affidavit that described his version of the
events.  The Court finds the agents' testimony credible and
credits their testimony.  The following facts are drawn from the
agents' accounts of the events that occurred on that day and
represent the Court's findings of facts.

     Defendant was arrested at his home located at 4 Reta Lane,
Port Monmouth, New Jersey on the morning of September 29, 2006.
(Mar. 20, 2007 Hr'g Tr. (hereinafter "Hr'g Tr.") 3:24-4:1.)  The
arrest team was made up of six agents from the Department of
Labor: Agent Ryan Gibbs, Agent Marcus Rivera, Agent Stephen
Donnelly, Agent Jonathan Malone, Agent James Woods, and Agent

Tina Seisis. (Id. at 4:7-14.) The agents arrived at
Defendant's residence at approximately 6:00AM (Id. 4:2-4), and
waited in their two vehicles for approximately 40 minutes (Id.
4:21-22). At approximately 6:40AM, Agents Rivera, Donnelly, and
Gibbs approached Defendant's home and knocked on the door. (Id.
5:5-8.) The Defendant answered the door, and the agents
identified themselves. (Id. 5:8-14.) The agents explained to
Defendant that they "wanted to speak with him regarding some
work he had done as shop steward at the 11 Madison job site."
(Id.) Defendant indicated that he did not want to speak to the
agents and attempted to close the door. (Id. 5:15-17.) Agent
Rivera prevented Defendant from closing the door and informed
him that the agents had a warrant for his arrest. (Id. 5:18-
20.) Agents Rivera, Donnelly, and Gibbs then entered
Defendant's residence and showed him the arrest warrant. (Id.
5:21-24.) The agents told Defendant that they would like to
speak with him and asked if there was somewhere where they could
talk. (Id. 5:25-6:3.) Agent Gibbs and Defendant then "stepped
down several steps into what appeared to be the basement" and
sat down in a seating area. (Id. 6:2-6.) Agent Gibbs then
"pitched" Defendant. (Id.) During the "pitch," Agent Gibbs
told Defendant that they "just wanted him to listen," and
informed Defendant of the investigation the Department of Labor
had conducted and the incriminating evidence they had obtained

3

against him.  (See id. 6:7-12.)  Agent Gibbs attempted to get
Defendant to cooperate.  In response, Defendant "said something
to the effect of 'Fuck off. I'm not cooperating with you. And I
want to talk to my attorney.'" (Id. 6:13-16, 52:19-21.)  Agent
Gibbs ceased talking to Defendant, began escorting Defendant
upstairs so he could get dressed (Id. 6:24-7:5), and called in
the other agents to perform a security sweep (Id. 6:20-23).  The
pitch took approximately "three to five minutes." (Id. 34:16-
18.)  On his way up the stairs, Defendant met his wife, and
instructed her to call his attorney. (Id. 6:24-7:1.)  Agents
Gibbs, Donnelly, and Rivera, then took Defendant to his room to
get dressed. (Id. 7:2-5.)  While Defendant was getting dressed,
the agents asked Defendant where his clothing was located, if he
had any shoes without laces, and if he was going to need any
medication for the next 24 hours or so. (Id. 7:6-13.)  When
Agent Donnelly handed Defendant a shirt from his wardrobe, which
turned out to be a union-logo shirt, Defendant asked for a
different shirt, and the agents gave the Defendant another
shirt. (Id. 8:5-12.)  While he was dressing, the agents did not
ask Defendant any questions about his conduct as a shop steward
(Id. 7:21-24), nor was there any discussion about the underlying
charges against Defendant (Id. 7:25-8:2).

    At approximately 6:55AM, the agents took Defendant out of
his residence (Id. 8:18-20), placed him in their vehicle, and

handcuffed him (Id. 8:25-9:2).  Defendant told the agents that
he had a shoulder injury and could not put his hands behind his
back, so to accommodate his injury the agents handcuffed
Defendant with his hands in front of his chest.  (Id. 9:4-9.)
Approximately two to three minutes after pulling out of
Defendant's driveway, Agent Gibbs read Defendant his Miranda
warnings in English from a pre-printed sheet.  (Id. 10:7-19.)
While reading the Miranda warnings, Agent Gibbs stuttered on one
sentence and Defendant remarked, in substance, that the agent
"didn't know how to read" and that he thought the agent "would
be better at this."  (Id. 10:22-11:2.)  Agent Gibbs recorded the
time and date the warnings were given on the Miranda sheet.
(Id. 35:24-36:5.)  The agents asked Defendant for directions out
of his residential development to the Garden State Parkway.
(Id. 54:3-7.)  Defendant gave the agents directions and they
proceeded north to the Garden State Parkway.  (Id. 54:7-9.)

     The car ride from Defendant's home to the Department of
Labor office located at 201 Varick Street, New York, New York,
took approximately two hours.  (Id. 9:14-17, 11:9-11.)  Almost
immediately into the car trip, Defendant began talking.  (Id.
12:5-9.)  All of Defendant's statements were unsolicited.  (Id.
12:21-24.)  Defendant spoke about his life experiences, his
Puerto Rican ancestry, his childhood, and his upbringing.  (Id.
12:10-20.)  Defendant also made statements about other union

officials.  (Id. 13:12-23.)  He stated that Gary DeMaria, one of

the owners of L&D installers who has since passed away, was in

hell for what he did. (Id. 14:3-5.)  In response to Defendant's

statements, Agent Rivera reminded Defendant that he had the

right to remain silent and told him he should use it. (Id. 14:6-

9.)

     Defendant continued to speak and proceeded to make

incriminating statements.  (Id. 18:7-12.)  Defendant asked Agent

Gibbs what type of evidence they had against him.  (Id. 16:4-7.)

Agent Gibbs told Defendant that he had interviewed several

carpenters who stated that they worked at Defendant's job site

and were left off the "sheet" -- the shop steward report.  (Id.

16:4-15.)  Agent Gibbs also told Defendant that he had compared

Defendant's shop steward reports with L&D timesheets for the 11

Madison jobsite and the two did not match.  (Id.)  In response,

Defendant said "he had to do it; he had to leave guys off the

sheet or he would have lost his job" (id. 13:1-3); that "he had

to play ball" (id. 15:24-16:1, 55:13-14).  Agent Gibbs followed

up by asking Defendant what he meant by having to do it.  (Id.

16:20-23.)  Defendant did not respond.  (Id. 16:24-25.)  Upon

hearing the statements made by Defendant, Agent Gibbs made a

note on an envelope he had in the front of the car and recorded

the time the statements were made.  (Id. 17:18-20, 32:2-3.)

In the course of the car ride, Defendant also posed questions to the agent.  Defendant asked Agent Gibbs several times if the Agent had been in the military. (Id. 14:12-14.) Initially, Agent Gibbs offered no response, but subsequently told him he was not.  (Id. 14:13-14.)  Defendant also asked Agent Gibbs what type of cooperation the agents were seeking. (Id. 14:15-17.)  In response, Agent Gibbs told Defendant that they would be interested in information about any union officials or other individuals whom Defendant knew were engaged in criminal activities.  (Id. 14:13-24.)  Agent Gibbs named specific individuals, such as business agent William Hanley from Local 157.  (Id. 14:24-15:3.)  In response, Defendant told Agent Gibbs, in substance, that the agent needed to get his facts straight because Fred Kennedy is the business agent, not William Hanley.

The agents initiated a conversation with Defendant only twice during the car ride.  The first conversation took place almost immediately after departing from Defendant's residence when the agents asked Defendant for directions out of his residential development.  The second conversation initiated by the agents took place approximately forty minutes into the ride when the agents stopped at a rest stop.  (Id. 11:12-17.)  The agents asked Defendant if he needed to use the rest room and if he wanted anything to eat or drink.  (Id. 11:18-23.)  In

response, Defendant declined to use the restroom but requested a
cup of coffee and told the agents how he would like his coffee.
(Id. 11:24-12-2.)

The agents and Defendant arrived at the Department of
Labor's offices at approximately 8:55AM.  (Id. 19:4-6.)  As they
approached the offices, Agent Rivera read Defendant his Miranda
warnings again from a pre-printed card.  (Id. 57:22-58:5.)
Agent Rivera read the warnings in English, and in response,
Defendant said that he did not understand English, even though
he had been speaking in English the entire car ride.  (Id. 58:
4-6.)  Agent Rivera then read the Miranda warnings in Spanish
(id. 58:6-8), and Defendant commented that Agent Rivera's
Spanish was "pretty good" (id. 58:8).  Defendant was then
brought into the Department of Labor offices to be processed.
(Id. 19:22-23.)  After processing, Defendant was taken to the
intake unit of the Marshal's Service in the Southern District.
(Id. 20:13-15.)


***Discussion***

***I. Defendant's Motion to Suppress Post-Arrest Statements***

Defendant Annucci moves to suppress all of his post-arrest
statements on the ground that the agents violated his Fifth and
Sixth Amendment rights by trying to "lure" him into
conversation, and by making continued efforts to obtain his

8

cooperation after he invoked his right to counsel and right to
remain silent.  (Def. Mem. at 11-12.)

   **A. There was no Sixth Amendment Violation.**

   Defendant's claim of a Sixth Amendment violation is without
merit.  The Sixth Amendment right to counsel "attaches only at
or after the time that adversary judicial proceedings have been
initiated against" a defendant.  United States v. Smith, 778
F.2d 925, 932 (2d Cir. 1985) (quoting Kirby v. Illinois, 406
U.S. 682, 688 (1972)).  "The instances in which the initiation
of adversary judicial proceedings have been found to give rise
to a sixth amendment right to counsel include 'formal charge,
preliminary hearing, indictment, information, or arraignment.'"
Id. (quoting Kirby, 406 U.S. at 689).  However, the Supreme
Court "has never held that the sixth amendment right to counsel
attaches at the time of arrest."  Id. (citing United States v.
Gouveia, 467 U.S. 180 (1984)).  Moreover, the Second Circuit has
held that the Sixth Amendment right to counsel does not attach
at the time of arrest upon on a warrant supported by a
complaint.  Unites States v. Duvall, 537 F.2d 15, 22 (2d Cir.
1976).  "Where a defendant has been arrested on a warrant but
not yet indicted, the Sixth Amendment right attaches upon the
defendant being arraigned."  United States v. Reich, No. 04 Cr.
257, 2005 WL 524553, at *3 (E.D.N.Y. Jan. 27, 2005).  Annucci
made the statements at issue after his arrest but prior to being

presented before a magistrate for arraignment.  Thus, the Sixth
Amendment right to counsel had not yet attached, and Defendant
cannot claim violation of that right.

### B. There was no Fifth Amendment Violation

In support of his motion to suppress his post-arrest
statements, Defendant argues that the agents violated his Fifth
Amendment right against compelled self-incrimination by making
continued efforts to obtain his cooperation after Defendant
invoked his right to counsel and his right to remain silent.
(Def. Mem. at 11-12.)

### 1. Defendant's Statements Were Not Obtained in Violation of His Fifth Amendment Right to Counsel

In Miranda v. Arizona, the Supreme Court held that the
Fifth Amendment privilege against compelled self-incrimination
requires that the defendant be advised of his right to remain
silent and to the presence of an attorney prior to custodial
interrogation.  384 U.S. 436, 444-45 (1966).  When an accused
invokes "his right to have counsel present during custodial
interrogation," "he is not subject to further interrogation by
the authorities until counsel has been made available to him,
unless the accused himself initiates further communication,
exchanges or conversations with the police."  Edwards v.
Arizona, 251 U.S. 477, 484-85 (1981).  "The remedy for a Miranda
violation is the exclusion from evidence of any ensuing self-

incriminating statements." <u>Neighbor v. Covert</u>, 68 F.3d 1508, 1510 (2d Cir. 1995). However, "[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not barred by [the Court's] holding" in <u>Miranda</u>. <u>Miranda</u>, 384 U.S. at 478.

The Court notes at the outset that the protections of Miranda "are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to <u>interrogation</u>." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300 (1980) (emphasis added). Thus, Defendant's claim turns on whether his incriminating statements were the product of "custodial interrogation." The Government contends that Defendant's incriminating statements were volunteered and should not be suppressed. The Government has the burden of proving by a preponderance of the evidence that a defendant made his statements spontaneously and not as the result of custodial interrogation. <u>See</u> <u>United States v. Anderson</u>, 929 F.2d 96, 99 (2d Cir. 1991).

"Custodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." <u>Miranda</u>, 251 U.S. at 444. Interrogation is not limited to "those police interrogation practices that involve express questioning of a defendant while in custody."

Innis, 466 U.S. at 298.  Instead, the act of "interrogation"
encompasses "express questioning or its functional equivalent,"
that is "any words or actions" on the part of law enforcement
agents that "were reasonably likely to elicit an incriminating
response."  Id.  "[T]his is not to say . . . that all statements
obtained by the police after a person has been taken into
custody are to be considered the product of interrogation."  Id.
at 299. "Interrogation . . . must reflect a measure of
compulsion above and beyond that inherent in custody itself."
Id. at 300.  In determining, whether the conduct at issue
constituted interrogation, the Court is to consider "the
totality of the circumstances of the agents' conduct."  United
States v. Cota, 953 F.2d 753, 758 (2d Cir. 1992).

    In reviewing the circumstances leading to Annucci's
statements, the Court finds that Defendant's Fifth Amendment
right to counsel was fully respected.  Upon entering Defendant's
home Agent Gibbs told Defendant to "just listen," and proceeded
to inform Defendant of the investigation conducted by the
Department of Labor and the incriminating evidence that was
obtained against him.  Agent Gibbs asked Defendant to cooperate.
In response, Defendant "said something to the effect of 'Fuck
off. I'm not cooperating with you. And I want to talk to my
attorney.'"  (Hr'g Tr. 6:13-16, 52:19-21.)  Whereupon, Agent
Gibbs ceased the questioning and proceeded to take Defendant to

his room so he could dress.  While Defendant was dressing, the
agents did not ask Defendant any questions about his conduct as
a shop steward (Hr'g Tr. 7:21-24), nor was there any discussion
about the underlying charges against Defendant (Hr'g Tr. 7:25-
8:2).

Once Defendant invoked his right to counsel, the agents
initiated three conversations with Defendant -- all of which
were unrelated to the charges against him.  The first
conversation took place when the agents brought Defendant to his
bedroom to dress and asked Defendant where his clothing was
located, if he had any shoes without laces, and if he was going
to need any medication for the next twenty-four hours.  The next
time the agents asked the Defendant a question, was upon leaving
his residence when the agents asked for directions to the Garden
State Parkway.  The third conversation took place at the rest
stop when the agents asked Defendant if he needed to use the
restroom or wanted coffee.  None of these questions "were
reasonably likely to elicit an incriminating response," Innis,
466 U.S. at 298, and as such they do not amount to "custodial
interrogation."

According to the testimony of the three agents, the
incriminating statements made by Defendant in the car were
unsolicited (See Hr'g Tr. 12:21-24, 58:15-17) – and I credit
this testimony.  During the car ride, Agent Gibbs did not try to

13

pitch Defendant to cooperate. (Id. 15:12-17.)  Nor did the
agents initiate a conversation with Defendant (Id. 18:20-25) or
discuss Defendant's case (Id. 19:1-3).  Therefore, I find that
the agents did not solicit or "lure" Defendant into
conversation.

The conversation that preceded Defendant's incriminating
statement was initiated by the Defendant himself.  Defendant
asked Agent Gibbs what type of evidence they had against him
(id. 15:4-7), and Agent Gibbs told Defendant that he had
interviewed several carpenters who stated that they worked at
Defendant's job site and were left off the "sheet" -- the shop
steward report (id. 16:4-15), and that he had compared
Defendant's shop steward reports with L&D timesheets for the 11
Madison jobsite and the two did not match (id.).  In responding
and describing the evidence that the investigation had produced,
Agent Gibbs "did not engage in express questioning or its
'functional equivalent.'"  See United States v. Cota, 953 F.2d
753, 759 (2d Cir. 1992).  As held by the Second Circuit in
United States v. Guido, an "officer's responses to [defendant's]
questions, even when viewed in light of the earlier suggestion
that he cooperate, do not amount to interrogation."  704 F.2d
675, 678 (2d Cir. 1983); see also United States v. Cota, 953
F.2d at 759 ("Where an agent 'supplied [the defendant] with
general information regarding the crime [s]he was suspected of

committing, in response to [his] own questions,' voluntary
statements made by a suspects who understands [his] rights are
not prohibited."). Absent such interrogation there is no
infringement of Defendant's Fifth Amendment right to counsel.
See Edwards, 451 U.S. at 486. Accordingly, the Court finds that
Defendant's incriminating statements were voluntary and not the
product of interrogation and therefore will not be suppressed.

The Government concedes that Agent Gibbs's follow-up
question to Defendant's incriminating statements, i.e. what did
Defendant mean by "playing ball," constituted interrogation.
(Government's Mem. at 13 n.2.) However, the Government does not
seek to admit any statements made by Defendant after Gibbs posed
the question. Accordingly, the follow-up question is not
relevant to the Court's conclusion that Defendant's prior
incriminating statements, which were the result of a
conversation initiated by the Defendant, were volunteered and
not the product of custodial interrogation.

Lastly, the Court notes that there is no evidence that
Defendant was so overborne or intimidated that his volunteered
statements should be rendered inadmissible. (See Hr'g Tr.
56:14-16.) There is no evidence that the manner of the arrest
was deliberately public or coercive. The agents waited until
Defendant was in the car to handcuff him, and accommodated his
shoulder pain by cuffing his hand in front of him. Defendant's

belligerent tone and statements ridiculing the agents illustrate
that he was not intimidated.

### 2. Defendant Waived his Right to Counsel

Even if the Court assumes that the agent's conduct
constituted "interrogation," Defendant's statements are still
admissible because Defendant knowingly and intelligently waived
his right to counsel.  In order to find that an accused validly
waived his right to counsel, the Court must find that "the
waiver was knowing and intelligent . . . under the totality of
the circumstances, including the necessary fact that the
accused, not the police, reopened the dialogue with
authorities."  Edwards, 451 U.S. at 486 n.9.  It is evident that
Defendant understood his right to counsel, as he invoked this
right even before Miranda warnings were read to him.  After
invoking his right to counsel and receiving Miranda warnings,
Defendant made several unsolicited statements to the agents.
Moreover, it was Defendant who initiated the subsequent
exchanges and conversations with the agents by asking them
questions about the evidence against him and the type of
cooperation the Government was seeking.  Thus, it is evident
that Defendant's incriminating statements were the result of his
own uncoerced choice to speak to the agents, and constitute a
knowing and intelligent waiver of Defendant's Miranda rights.
Therefore, the incriminating statements are admissible.

**3. Defendant Never Invoked his Fifth Amendment Right to Remain Silent**

Defendant's claim that the arresting agents violated his right to remain silent is without merit.  Defendant was read his Miranda rights and informed of his right to remain silent at the outset of the car ride.  However, Defendant never exercised his right to remain silent.  Immediately after his Miranda rights were read to him, Defendant criticized Agent Gibbs's reading ability and told him in substance, that he "should be better at this."  (Hr'g Tr. 10:22-11:2.)  During the duration of the car ride, Defendant proceeded to make numerous, unsolicited remarks on a range of topics.  Defendant was reminded by Agent Rivera of his right to remain silent and advised to exercise it, but Defendant continued to make unsolicited statements and ask the agents questions.  Accordingly, the Court finds that Defendant never invoked his right to remain silent; therefore, his claim that the agents violated his Fifth Amendment right to remain silent must fail.

Moreover, even if Defendant had invoked his right to remain silent, he waived this right through the initiation of conversations with the agents and his multiple volunteered statements.  In United States v. Montana, the Second Circuit found that a defendant's "initial unsolicited, inculpatory remark waived his right to remain silent . . . and subjected him

17

to permissible questioning." 958 F.2d 516, 519 (2d Cir. 1992).
Similarly, in the case at bar Defendant's multiple unsolicited
statements to the agents effectively waived his Fifth Amendment
right to remain silent.


## II. Defendant's Motion to Dismiss Count Two of the Superseding Indictment.

Defendant has moved to dismiss Count Two of the Superseding
Indictment, which charges Defendant with aiding and abetting
L&D's violation of Title 18, United States Code, Section 664.

"[A]n indictment is sufficient if it, first, contains the
elements of the offense charged and fairly informs a defendant
of the charge against which he must defend, and, second, enables
him to plead an acquittal or conviction in bar of future
prosecutions of the same offense." United States v. Alfonso,
143 F.3d 772, 776 (2d Cir. 1998) (quoting Hamling v. United
States, 418 U.S. 87, 117 (1974)). Federal Rule of Civil
Procedure 7(c) governs the type of information that must be
contained in an indictment and provides that "the indictment . .
. shall be a plain, concise, and definite written statement of
the essential facts constituting the offense charged." F. R.
Crim. P. 7(c). "To be legally sufficient, an indictment 'need
do little more than to track the language of the statute charged
and state the time and place . . . of the alleged crime.'"

<u>United States v. Orefice</u>, No. 98 Cr. 1295, 1999 WL 349701, at *4

(S.D.N.Y. May 27, 1999) (quoting <u>United States v. Grossman</u>, 843

F.2d 78, 84 (2d Cir. 1988)).

The text of Title 18, United States Code, Section 664,

provides, in relevant part, that:

> [a]ny person who embezzles, steals, or lawfully
> and willfully abstracts or converts to his own use or
> to the use of another, any of the moneys, funds,
> securities, premiums, credits, property, or other
> assets of any employee welfare benefit plan or
> employee pension benefit plan, or of any fund
> connected therewith, [shall be guilty of a crime.]

18 U.S.C. § 664.

Defendant challenges the legal sufficiency of Count Two on

the ground that L&D's failure to remit contributions to the

employee benefit funds could not constitute embezzlement of plan

"assets" for purposes of criminal liability under Section 664

because the underlying agreements between L&D and the union

provide that contributions do not become "assets" of the plan

until they are received.  (Def.'s Mem. at 8-9 (citing Article

III, Section 1 of the Plan Documents)).  In other words, because

the monies owed to the plan were never received, they were not

"assets" under Section 664, and by extension, Annucci could not

have aided or abetted a violation of Section 664.

The very argument that Defendant is advancing was rejected

by the Second Circuit in <u>United States v. LaBarbara</u>, 129 F.3d

81, 88 (2d Cir. 1997).  LaBarbara was convicted of aiding and

abetting in violation of 18 U.S.C. § 664.   LaBarbara challenged his conviction on the ground that the monies owed to the benefit funds were not "assets" until banked.   Id.   The Second Circuit rejected this argument and held that "[o]nce wages were paid to [the union members], [the contractor] had an obligation to the Funds that constituted 'assets' of the funds by any common definition."   Id.   In addition, the court stated that "LaBarbara's accepting kickbacks in return for allowing [the contractor] to avoid its obligations to the Funds was the functional equivalent, of and more harmful than, stealing directly from the Fund's bank accounts."   Id.

The Court recognizes that LaBarbara's holding has not been universally followed in other circuits, and courts are divided about how and when employer contributions become plan assets for ERISA purposes.   See United States v. Whiting, 471 F.3d 792 (7th Cir. 2007) (finding "in line" with LaBarbara that unremitted employee contributions can be plan assets for purposes of § 664); United States v. Grizzle, 933 F.2d 943 (11th Cir. 1991) (unpaid employee contributions subject to embezzlement by employer in violation of § 664); United States v. Jackson, No. 04 Cr. 70118, 2006 WL 1587457, at *6 (W.D. Va. June 7, 2006) (noting that Section 664 does not refer exclusively to plan "assets," but addresses the conversion of "any moneys, funds, securities premiums, credits, property or other assets" of a

plan and "the use of the word 'credit' indicates that Section 664 reaches beyond those funds actually in a plan account"). But see ITPE Pension Fund v. Hall, 334 F.3d 1011, 1013-14 (11th Cir. 2003) (in civil ERISA suit, holding that paid unpaid employer contributions to a benefit plan are not plan assets unless the agreement between the employer and the fund specifically declares otherwise); Cline v. Indus. Maintenance Eng'g & Contracting, 200 F.3d 1223, 1234 (9th Cir. 2000) (contributions do not become plan assets until employer pays contributions to plan).  But LaBarbara is binding precedent in this Circuit and the Court does not find a reason to depart from its holding.  Accordingly, Defendant's motion to dismiss Count Two of the Superseding Indictment is denied.

*Conclusion*

For the foregoing reasons, Defendant's motion to suppress his post-arrest statement is DENIED; Defendant's motion to dismiss Count Two of the Superseding Indictment is DENIED.

The parties are directed to contact chambers to schedule the next conference.


**SO ORDERED:**


_____

21

SO ORDERED:

_____
BARBARA S. JONES
UNITED STATES DISTRICT JUDGE


Dated:     New York, New York
           April ___, 2007

22